for the petitioner's Long Island Power Authority and Long Island Lighting Company doing business as LEPA petitioners versus Federal Energy Regulatory Commission. Mr. McBride for the petitioner's Long Island Power Authority et al. Mr. Konopka for the petitioner Lyndon VFT LLC. Mr. Viswanathan for the respondents. Mr. Longstreth for the respondent interviewers. All right. Mr. McBride, good morning. Good morning, Judge Henderson, and may it please the court. The Seventh Circuit's mandate was to quantify the benefits for each of the vintage projects at issue. FERC failed to do that or to cite any testimony or other evidence doing so for each of the three categories of costs at issue. For the pre-2016 costs, the debits and credits agreed to in the settlement were a black box settlement. That is no explanation of how the amounts were derived. Merchants were supposedly no worse off than if we had litigated the matter. But that is just a cost-to-cost comparison, not a cost-benefit comparison, and it presumes the conclusion of the methodology that FERC would have used had the case gone to hearing. And we were worse off as we demonstrated in our reply brief at node three. For the pre-2016 costs, our costs went up about $5.8 million, and overall, our total costs went up from $16 million to $31 million. For the second category, for the canceled projects, FERC's rationale was that it could rely on so-called violations-based defects, even though it had previously rejected that method because it hadn't, it said, rejected it as the sole means of cost allocation. But in fact, FERC was urged by the Illinois Commerce Commission to use that violations-based defects for part of the cost allocation, and FERC's response was to reject it altogether. That's at JA461. FERC has not justified how it is now justified to use that methodology that it previously rejected. For the costs starting on January 1, 2016 Mr. McBride, if I could interrupt you, the Seventh Circuit made clear that the posted stamp method won't work, and I'm sure you would not want 100% flow-based method. So what do you propose? What ratio is it that you think FERC should have chosen? Well, for one thing, Your Honor, what we really were contending here is that we needed to have an as-applied determination. So even if you start with the quarter-1,000 hybrid methodology, there were aspects of the settlement that were highly prejudicial and that we had no part in negotiating, such as for de minimis and for netting. So for de minimis, for example, a system as large as PSE&G, if a project had a load of less than 1% of PSE&G's total load, and so that 1% would be 1,150 megawatts, you'll find that at JA150, then PSE&G would bear no costs for that project altogether, and those costs would be reallocated to the other participants, particularly the merchants. And as to netting, netting is useful for the big systems like PSE&G and the others because they have flow in two directions. But as Lyndon pointed out at JA163, netting doesn't even apply to the merchants because the flow is only in one direction. Let's be honest, on the big conceptual question that was at issue in the Seventh Circuit cases and in Old Dominion, which is where on the spectrum between postage stamp and flow, what is the appropriate mix of cost for high voltage facilities? You want postage stamp. We didn't argue for that as the only method, Judge. We said it was an alternative. The one-to-one hybrid is $30 million worse for your clients, and a defects-only method would be even worse. Well, our showing, the commission's finding at JA353 and 398 was that we were $31 million of additional or total cost as opposed to $16 million. So it's the settlement and the provisions of the settlement that are really the problem, Judge. The settlement which implements the one-to-one methodology that is now routinely used under order 1000. But it's not just the one-to-one as I was just indicating. It also includes the aspects like the minimus and netting that were highly prejudicial to us. Okay. So if you don't if you're not pressing the conceptual point, what I call the macro point of pure postage stamp versus pure defects versus some kind of hybrid, and what you're saying instead is that there were a lot of subsidiary details that FERC should have looked at more closely instead of just making this overall ballpark judgment. That seems like that's just a challenge to their trailblazer framework, no? No, your honor. Why? Trailblazer too which was their basis here is just to make an overall determination that is just and reasonable without looking at the component parts. And I'm urging that they would have had to look at the component parts. Exactly. So you're saying that trailblazer too is not a lawful way of for FERC to approve contested settlements. Perhaps in other contexts, but here where we had the mandate and cost-benefit was required, and we needed discovery to show what the assumptions were in the models and what the power flow data were, the base period for which they were used, and that sort of thing. And to force the interveners to put on a case that showed cost-benefit and then we could put on an opposing case and then FERC would have to resolve the disputes. Right, but I mean, Illinois Central, neither Illinois Central case involved approval of a  So however, I mean, whatever you think of the mixed signals from Judge Posner's opinions, they really don't speak to the trailblazer question that we've been discussing, which is in the settlement context, is it good enough for FERC just to look at something overall, or are they legally required to separately address all of the granular details that you're pressing on us now?  members of the 7th Circuit, of course, didn't have a settlement in front of them. But our point here was that when we contested this and we showed that the methodology, despite the interveners' assertions that we would be better off, we weren't better off, we were worse off, and that we were entitled to show that there were problems with the settlement that made us so. And so it was really an as applied challenge that we were trying to present and that we were prevented from presenting. So do you quarrel with FERC's reasoning to the extent they said that we now have the hybrid 50-50 methodology which we use, we approved it in 2013, it's produced consensus among all of these utilities who had been at each other's throats, so we are going to apply that methodology here. Do you dispute that aspect of their reasoning? I thought your whole case was that they can't do that. They have to redo the 2013 compliance determination in the context of this administrative record. Well, note that FERC itself said at JA3 that the hybrid methodology was just an outline, and our point here was that as applied to these projects, and we showed this in our comments contesting the settlement, the basis for the settlement that we were supposedly better off was not correct, and that when you included the Susquehanna Roseland project, for example, we were a lot worse off, and those are the tables at JA353 and 398. Sure. I understand you're worse off, but they said in the but-for world where you litigate, you weren't going to get the postage stamp method that you want. You're going to get a hybrid. Well, again, we you're going to get the rule of law you get here will be the one-to-one, the 50-50 rule that FERC uses, and the arcane adjustments under these three-track method is designed roughly to replicate what you would get under the 50-50 order 1,000 approach. Well, the problem that we had is it's not just this 50-50 approach. That's the problem. It was a settlement that had a lot of other provisions in it that were prejudicial to us. But that's what I'm just trying to isolate here. Are you complaining about applying the 50-50 rule, or are you complaining about all this other details? Well, it's very difficult to  the interveners, you know, who were parties who had the burden below would have had to present cost-benefit testimony to justify the settlement. And FERC itself said that that's what was required at JA67 in the order on remake. And then we would have been able to present cost-benefit testimony in the alternative showing what was wrong with their testimony, and that's what the hearing would have been about. So it's not just the conceptual, but it's the as-applied that I'm trying to explain was really our concern here. Okay? All right. If there are no more questions, then we'll hear from Mr. Konopka. Can you hear me? Yes. Great. Good morning, Your Honors, and may it please the court. Eric Konopka for Linden VFT. Up to this point, we've been talking about reasons why the settlement should not be upheld. But if it is upheld, it should at least be interpreted and addressed. That means Linden VFT cannot be held liable for transmission enhancement charge adjustments because it was not subject to transmission enhancement charges at any point during the period in which adjustments are collected. Now, I don't have a lot of time, and I'd really like to stress two points. First is that on the text, there are really two key phrases here and it's in which and are collected. If the settlement had said, for example, the period in which adjustments are collected or the period in which adjustments accrue, then FERC's interpretation of it may make sense. But those aren't the words that the settlement uses, and the words that the settlement does use in which adjustments are collected are used not only in the paragraph that we're relying on, 2.2e2, but also in the very next paragraph, 2.2e3, and nearly identical words are used in the prior paragraph, 2.2e1 of the settlement. So these weren't, you know, this wasn't an accident, it wasn't an error, these words were chosen. The second point is related. Your position seems pretty strong on the language of Schedule 12C, but what do you do with the language in the settlement agreement? I think there's some JA88, JA86. There's a formulation which says effective 1116, which is the effective date, not the approval date, PJM shall collect. Sure. Isn't that some, at least a clue that collect in this context might have a counterintuitive meaning of accrue? Sure. So a couple of points on that, Judge Katsas. You know, number one, we think that the two provisions are actually reconcilable and we've reconciled them in our brief, but if the court perceived any conflict between them, then, you know, we think that the tariff should govern, that the Schedule 12C should govern, and FERC itself in its briefing focuses on Schedule 12C, so that's the filed rate that should be applied to us, and so the language of that really should control, but we think that they're totally reconcilable because of the way that the settlement works, and it may be worth kind of giving our conception of how it's going to work, so Sections 2.2B and Sections 2.2D and E of the settlement sort of, they incorporate a list of dollar amounts that were assigned to us by the settling parties in an appendix to Schedule 12C. Now, Sections 2.2B and Sections 2.2E make clear that those amounts are subject to change depending on the exceptions, the exception that we're relying on as well as another one, so the way that we think that this has to work is that you apply our exception first, 2.2E2 first, and that has the effect of zeroing out our adjustment number, and then other parties' adjustments would be increased by a very small amount, about .8% to account for us, and then those amounts would have to be made retroactive to January 1, 2016, including with interest, and we think that's how the settlement operates, and we think, again, sort of getting to my second point, that's for good reason. I mean, we don't have a ton of insight into why the settlement was drafted this way, but the provision that we're relying on seems to be an administrative one. What it's basically saying is that, you know, when we gave up our firm transmission withdrawal rates, we stopped being liable for transmission enhancement charges. PJM stopped billing them for us and stopped collecting them from us, and so what this settlement provision is really saying is that if PJM isn't billing you and collecting charges from you, then it shouldn't bill and collect you for adjustments either, and we think that's buttressed, and among other places in section 2.2b, which makes clear that PJM shall collect adjustments as a separate line item on customers' bills. Thank you, your honors. I see I'm out of time. All right. We'll give you the minute you requested in reply. Thank you, Judge Anderson. Uh-huh. We'll hear from FERC counsel, Mr. Viswanathan. Good morning, your honors. Anand Viswanathan on behalf of the commission. I'll start off with where we left off on the language of the  Judge Katsas, you pointed out the provision of section 2.2d that states that effective January 1, 2016, PJM shall collect. I can also ask you to compare that language and that usage of collect with section 3 of schedule 12c, which uses the word collect in a slightly different way. That's the provision that says that PJM shall track and accumulate. Sorry, where are you? You said D, which is the JA88? Right. So I'm asking you to compare that with what's on JA100, which is section 3 of schedule 12c. 88 seems to me doesn't help you as much because it says collect or accredit. So that could easily just mean from in the transition period, from 16 to 18, they're not collecting, but they're crediting. Well, okay. But it also uses the same phrase that's used in section 4c.1.2 of schedule 12c, as well as... Sorry. That schedule. I'm sorry. 4c.1.2. Okay. That's the main... Right. That's the provision that's been disputed. And so I guess my first point is Lyndon is focused on the phrase collected in that provision, but I think what the commission is trying to convey is that that word is used in a few different places in the settlement, and it means slightly different things. And so on the prior page, JA100, what it says is that between January 1, 2016, and the date of the first quarter authorizing PJM to begin collecting, so that's one usage of that word. And then if you compare that use of collect with 2.2D, which states that PJM shall collect or credit on effective January 1, 2016, I think based on that, the commission found that it's a more reasonable reading of 4c.1.2 is that it's referring to the entirety of the time period. Another point the commission focused on is not just that phrase in 4c.1.2, but the entirety of the sentence in which it is located. And so what it says is during the period in which transmission enhancement and charge adjustments are collected. And so there's no definition or explanation of what that time period is in that provision. The closest time period we have is in the preceding umbrella paragraph in 4c, which is what the commission called the entire adjustment period. You wouldn't disagree. If we start from the directly controlling text and work our way outwards, by far the more natural reading of collect is to collect the money, force transfer of money from the utilities to PJM as opposed to accruing the liability on the recording the liability on the balance sheet of the utilities, right? Well, but I think when you consider the entirety of the settlement and other provisions, I think that's when that reading starts to make less sense. Yeah, but I'm not sure that I'm not sure the other provisions help you very much. So, I mean, just working outward from that provision of the tariff, one provision later you have paragraph 5, which contrasts collection with payment. And one paragraph earlier, the section you were talking about is an entire regime set up to deal with this transitional issue of the two-year period between the effective date and the when the liabilities kick in and the approval date when PJM can start the collection. I mean, it all seems everything in the tariff seems to hang together to support Lyndon's view. I'm not sure that's right. I think I can point you to one more provision, Judge Katz. This is on. I mean, the best one I could find for you are the provisions in the settlement offer, and I don't know that those have quite the same weight. But go ahead. Within 12C. I was going to point you to one of the terms of the settlement itself on JA85. This is 2.1. I'll let you do that in a second, but do you have anything in 12C that you want to start with? I think that 12C, I think, are what I've already said, which is number one, the tracking and accumulating obligation in section 3. And this is important because if Lyndon is right, that means that their reading of 4C.1.2 is focused on that word collect would essentially undo the tracking and accumulating obligation in section 3 of 12C. And the other piece is what I've already said, which is the only time period that's actually defined in 12C is the one in the umbrella paragraph 4C. And so it's a reasonable reading of 4C.1.2 that during the period in which the adjustments are collected must refer back to the period where that's defined. I can also point you to the last sentence or last phrase in 4C, which says this is at the end of 4C. It says subject to adjustment in accordance with subsection 4C.1. And so I think a reasonable reading of that is that what follows 4C, that is subsections 1 and 2 of 4C.1, are subject to what has previously been stated in 4C, and 4C is where we have that full adjustment period of 2016 to 2025. So that's what I have for you on 12C. I can just point you to back in the settlement, JA85. This is section 2.1. The commission emphasized that so this is the provision that explicitly in the settlement separates out the effective date for adjustments and the effective date of the settlement itself. And that latter date is dependent on when the commission actually approves the settlement itself. So the point of this here is that regardless of any, for example, delays in approval of the settlement, that doesn't change the fact that adjustments are effective as of January 1, 2016. They continue to accrue. So can I take you back to JA100? Yes. The paragraph 3 that you suggested is probably the most helpful to you. I read in a different way. I wonder if you can tell me where you think I went off track here. PJM shall track and accumulate the differences between amounts collected. So to me, and then they're going to take that amount and they're going to subtract basically what 12C otherwise would have required. Tracking the difference, so we're talking about a subtraction here, between the amounts collected versus the rates and charges applicable under this schedule 12C. And so that kind of subtraction problem to me really only makes sense if collected is the kind of collect that Lyndon is talking about. Because you wouldn't take as your first amount in that equation what perhaps a company was billed but didn't actually end up paying. You would want to know what they actually paid, what was actually collected from that company. That's the amount that you would then use and then subtract from that what should have been collected under 12C. Imagine that I'm just a customer and a company is trying to figure out what I owe them versus what they owe me. And what should have been paid is what was under schedule 12C. What are they going to compare that to? They're going to compare that to what I actually paid them, what that company actually collected. They're not going to compare it to maybe a bill they sent me that I never actually paid and that they never actually collected. So to me, don't tell me why I'm wrong. Tell me why I'm misunderstanding how the word collected is being used there. Well, I think what you're saying is sort of premised on the fact that maybe the bills have already been collected. And so what the settlement is covering is amounts that were already collected as well as amounts that would be due under the previously remanded method. They're taking the first of those and they're subtracting from that the second of those, right? It's not necessarily a subtraction because if you paid a certain amount under the postage stamp and you are now under the new method, you need to pay more money, then it wouldn't be a subtraction, it would be a payment. So that's why I think there's references to both payments and credits throughout the settlement. Right. But, you know, you could say subtract, you could say 3 minus 4 equals negative 1. And that would be a credit. Or you could say, let's say that it was 5 minus 3, that would be 2. So that would be a debit. But my point is, when you're trying to contrast what is applicable under 12C with some other number, and then you're using those two in an equation to get what is owed either to or from PJM, you would take what was actually collected, what was literally obtained from the company, and then you would say let's compare that amount that was obtained from the company with what 12C says should have been obtained, right? Again, assuming we're talking about amounts that have already been paid, but there are ongoing costs with respect to these facilities. Obviously, these transmission lines exist for decades and there's annual costs. And so now the settlement is changing the amount of costs that are allocated. That is the costs that have already been paid for these facilities as well as costs that are going to be paid going forward. So it's not necessarily the case that the amounts that we're talking about are all amounts that have already been paid for. And so what the postage stamp method said is you already paid a certain amount based on your share of the entire network, and you continue to pay that share going forward, and the settlement changes that calculus. And so that's why there's a difference in terminology for what we've called the pre-2016 costs, which were those were already paid. And so the settlement is adjusting those versus what are called the current recovery charges, which are the costs going forward post-2016. And I think that what the commission tried to emphasize here is that there's an obligation on PJM's part to track and accumulate these liabilities starting in 2016 up until the point where PJM's authorized to actually go out and get the money. And so if Lyndon was right about their reading of 4C.1.2, that essentially means that a private party like Lyndon, all it has to do to get out of its liabilities under the settlement is to just beat the commission to the punch. And I think that what the commission was trying to do is read all these provisions in a way that gave all the meaning. And if Lyndon's right, that means that the ability of PJM to go out and get this money would be severely hampered. I'll just add here that this court has consistently deferred to the commission on its reasonable interpretations of 4C.1.2. So I'll try to see if I have other provisions for you. So I think that based on what we've seen in 4C.1.2, I don't think you can read 4C.1.2 as clear and unambiguous as Lyndon has argued. So then the question is whether the commission's interpretation is reasonable. That's not an unreasonable interpretation. If we can come up with a different interpretation, the question is whether the commission's interpretation is reasonable. If I can step back and go to some of the court's questions of Mr. McBride. Can I ask you one question on that set of issues? Which is where in this record or in the rule 1,000, sorry, order 1,000 compliance record would I find, would one find some very rough estimate of the quantification of system-wide benefits that would justify the 50-50 hybrid? I mean, it just seems like there's an intuitive appeal to that hybrid, but you know that all postage stamp is no good because the Seventh Circuit has said that, and all DFAX is no good because we said that in Old Dominion. And it just reads a little bit like a Goldilocks theory of rate-making, which is 100% one way or the other no good, so 50-50 is in the middle. Where would we find some justification for the 50-50 other than just happens to be in the middle? I think I can point you to what the commission said in the December order. This is JA 390. This is paragraph 44, and it provides an explanation for each of those pieces. I'll just point out that at least with respect to the postage stamp piece, some of the questions to Mr. McBride indicated this, it does not appear that the petitioners have a problem with the postage stamp approach and the notion that there are broad, region-wide benefits to these facilities. With respect to the... I agree with that, and I think the DFAX component of the 50-50, you've given some rough justification, which is flow can be a proxy for dollars, and that's without prejudice to the challenge in the separate case, but for purposes of satisfying Judge Posner and cost causation, good enough. I don't see anything like that. Put aside the question of whether these petitioners are the right parties to be raising the question, I don't know what question Judge Posner had about postage stamp, but where is the attempt to quantify the system- wide benefits that are, you know, if you upgrade something in New Jersey, the power plants in Chicago are going to benefit from? So I can't point you to anything in the record that attempts to quantify the regional benefits. What I will say is that both the commission and this court and the Seventh Circuit have repeatedly stated that generally speaking, enhancements to a transmission system benefit the entire system. Now obviously the Seventh Circuit had an issue with the assumption that 100% of the costs of those can be shared on a postage stamp basis, and that's the problem where you have someone in the Midwest having to pay for facilities in the east to remedy liability violations in the east. But there does not seem to be a dispute anywhere that at least there's some benefit to users of the transmission system writ large based on enhancements to that system. And I guess the question here is not so much, I mean, you point out the Goldilocks methodology, but at the same time, we're not here to find whether there's some more optimal alternative. The question is whether what the commission did is reasoned decision-making and whether it is overall just and reasonable within the meaning of commission policy and the second trailblazer approach. We haven't seen anything from the petitioners to question that. I think they repeatedly argued that the commission completely failed to quantify benefits, but the fact of the matter is the flow-based piece of the hybrid methodology does in fact attribute benefits to individual users based on their projected usage of the system. That's something the Seventh Circuit acknowledged. If I can just clarify one piece that came up a few times from your questioning, Judge Katz, with Mr. McBride, there were a few questions about whether they were complaining about the component pieces of the hybrid methodology or just the 50-50 method itself. The answer that you got back seemed quite different than what we've seen in the opening brief, and so I just want to clarify this. There were some references to the de minimis issue, the de minimis threshold and the netting issue. That was raised for the first time on the reply brief. The opening brief, the only reference to the de minimis threshold is in page 12 of the facts section, and that's that I think it's in a footnote, and that specifically notes that these issues are the substantive validity of that method is a quote key issue in the 151183 appeal, and there's no mention at all of the netting point. So to the extent that the petitioners are now trying to bring in those issues, I would say those are forfeited. Oh, there was one more point that was raised in terms of the petitioners' claim that they are not better off. The commission relied upon expert testimony that was unchallenged in the opening brief that found, for example, that with one exception, all of the other contesting parties were allocated lower costs under the settlement than they were under the prior postage stamp methodology. That's a big exception, right? Yes, the one exception is the Susquehanna-Roseland project, and with respect to that project there was also expert testimony that found and the commission agreed that the costs that were allocated under the settlement for that project were substantially similar to what they would have been under the hybrid method. But not under the postage stamp method. I think you all agree. The petitioners are worse off under the hybrid method than they would have been under the postage stamp method, right? Well, okay. That might be true. Well, they actually are better except for one. It's kind of like it was a good day at the theater for Lincoln except for the assassination. It's a big exception. They're $15 million worse off. Right. So the question under commission policy that was whether they are no worse off under the terms of the settlement as compared to continuing litigation. And so what the commission found based on that expert testimony with respect to that one exception is that because that project was placed into service fairly close to the 2016 cutoff date when the hybrid methodology starts, most of those costs are going to be recovered under that method anyway. And so the settlement's allocation with respect to that project is going to be substantially similar to what it would have been under the hybrid method. Doesn't this question of whether they're better or worse off boil down to the underlying merits question of whether postage stamp would have been the prevailing method? I mean, in some respects, I think the issue under trail blazer is making a prediction about what would have happened if you continued the litigation out to its conclusion. I think what the commission found is that if the prediction is that postage stamp would have prevailed, these folks are clearly worse off.  under the settlement. So your position on this has to be that that would have been the prevailing method. That was not a plausible outcome for all the same reasons that you now advocate 50-50 over a pure postage stamp or a pure defects. I think that's right, and I think the commission said that because of the fact that the seventh circuit was quite emphatic on two separate occasions as to the problems underlying the 100% postage stamp, that continuing litigation wouldn't result in a 100% postage stamp approach at the end. Right. All right. Let's hear from Mr. Longstroth for the intervenors then. Thank you. Thank you, and I'd like to just briefly address some of the points from the perspective of the respondent intervenor parties who include nine transmission owners, six state regulatory commissions and PJM itself. We believe the settlement is unquestionably in the public interest, and the commission probably considered the positions of the two parties that are objecting to it here. I'll start by going back to Judge Katz's point about 50-50 and Goldilocks and all that. If you look at the PJM compliance, order 1,000 compliance order in 2013, which was the basis for this because that was the basis for the settlement, the commission went through very carefully why the 50-50 took into account both the regional benefits and the specific flow-based benefits, and no one objected to that, including these parties. And if these parties, as you point out, are not really, you know, the proper position to challenge that here, there's really nobody challenging it. And I think it really was something that, you know, the market to some extent has spoken up, and all of the interested parties got together and decided that really was something that was a rule that applied. So, you know, part of the problem with the region-wide benefits, and I know Judge Posner went into this a little bit, but it is very hard to quantify those specifically. That's the whole point of a postage stamp system. But the idea, I think, that the problem the Seventh Circuit had was if you go entirely postage stamp, people who have nothing to do with the project are paying even more, for example, than people are taking flow directly from it, and the solution-based defects, as I think you pointed out, takes care of that. And, again, that's not the situation we have at all here with these parties. You know, these parties are taking energy from the Susquehanna Roseland project. It was built to resolve problems in northern New Jersey. That's where these people are. They are benefits. As a matter of fact, the commission pointed out they would have benefited even under the old violation-based system. There is testimony directly in the record, JA241, that points out that the flow they're taking from this project is greater than the amount that they're being charged under the settlement for the project. So, again, this notion that no one presented testimony as to whether or not they were benefiting from this, it's in the gas declaration. There was also a McGlynn declaration. There was a Schnitzer declaration. As FERC counsel pointed out, all of those were ignored in the opening brief where the petitioners were incorrectly arguing there was no evidence of benefits here. So I think that kind of puts that all out. On the de minimis, I think FERC is correct that that was something that came up in the opening brief. I think it's kind of at the end as they're trying to throw a bunch of stuff against the wall to see if they can do something to derail this settlement. The only thing I would point out on that is I think Mr. McBride mentioned, well, that allows somebody like public service, electric and gas, PSEG, to avoid responsibility. You know, PSEG is paying, I think, at least 60% of the cost of this. This notion that somehow a de minimis rule is being applied in this case, whatever their problems with it might be in some other case, the notion that it's being applied in this case so that parties can avoid their responsibility is I think just fanciful. The commission had that all in front of it. We presented testimony. They presented testimony. The commission considered that under a paper record as they do in very many cases, and that was pretty much it. They can support it under the as a proper settlement that's certainly well within the bounds of reasonableness. The only other thing I wanted to raise was the contractual issue that Lyndon has gotten into. And the only thing I would point out, I think, Judge Katz, is you talked about the settlement offer and you mentioned, well, maybe that doesn't have quite the weight. The settlement offer is a file degree, but that's part of the settlement. So this isn't a situation where the settlement offer is some kind of parole evidence or legislative history that's trying to be used to override the language of the agreement. And the language of the agreement, I think even Mr. Konopka said something on the order, well, if it had said the period in which it's collected as opposed to for which it's collected, that was really a problem. All we had to say was for which. And, you know, the intent of the settlement would have been to have the agreement manufactured. You know, I think you're getting awfully fine into these very, you know, very, you know, intricate arguments. I'm not going to get into all of that except to just point out that the general principle, and there's a case that you guys have, Arkansas Public Commission versus FERC, it's an unpublished decision, but it does go through the general principle that when you withdraw from an agreement, if you have accrued obligations, I think they say in that particular case FERC concluded that a party's accrued contractual obligations continue beyond its withdrawal from a contract. What happened here was they had obligations under the contract because they had firm withdrawal rights. They decided a couple of years into the period in which these charges were being collected for the ten-year period, well, we'll just get rid of our firm withdrawal rights and we'll avoid our obligations, and I think the quite natural response to that is okay, maybe that's fine going forward, but you've accrued these obligations for two years during the period, that's what we had set up this whole settlement designed to collect, and, you know, you're responsible for those two years, even if you got out of it for the eight years after. It's very consistent. This guy is calling time on you. Thank you. I'm sorry. Thank you. And I appreciate the carts and dolphins. All right. Mr. McBride, why don't you go ahead. Mr. McBride, you're muted. Can you hear me now? Yes. Thank you. So first on the commission's  opening brief anything about the problems with the withdrawal contract. We did put it in the opening brief. We had no lack of evidence about benefits and how they would be applied to these projects. We did indeed do so at pages 35 to 36 of our opening brief, and we showed that the benefits did not flow equally with respect to all the projects and that the merchants derived different benefits, and we had evidence disputing the methodology in general as well as the specific application to the vintage projects. The point is, and I think Frick conceded, that there were no quantitative findings that it made on cost-benefit, and the roughly commensurate test requires that there be such. There has to be some showing that costs and benefits are even roughly commensurate, and there is no finding here from the commission to that effect, so that the commission simply can't satisfy the mandate. I want to point out that at page 12, note three of our opening brief, as well as page 37, note 11, and in the recent SCNG versus Frick decision of this circuit, there are numerous examples of how the general methodology does not produce roughly commensurate benefits in accordance with the costs that are allocated. So, you know, it seems clear to me that what happened here was Frick didn't want to put on an opportunity, give us an opportunity to look at the evidence, give us an opportunity to show on an as-applied basis or otherwise that the evidence was such that there was a roughly commensurate balance between costs and benefits. So I'm sorry? Go ahead. Finish your thought. I finished, Judge Henderson. Thank you. All right. Then Mr. Konopka, you asked for one minute in reply. I did, Your Honor. Thank you. I think I'd like to make just a couple of points. You know, Mr. Longstreth, I think at the very end of his argument suggested that there's some free-floating intent of the settlement that's somehow not embodied in the text and that the court should construe the text in accordance with that intent. But, of course, the text is the best evidence of the intent of the parties, and here he didn't say anything about in which meaning something other than in which. The second point I'd like to make is there seems to be some idea that there was an accrual of liability here. You know, our whole point is that the settlement provision talks about the rates and charges due under the settlement, and, of course, the exception that we're relying on means that our rates and charges due under the settlement are zero for the adjustment. Mr. Konopka, let me ask. I know our time is short, and we've been quite in the weeds of the JA, but let me ask you one question about JA 102, if you could go there, please. Sure. I'm going to ask. This is the paragraph immediately following the key paragraph whose meaning we're trying to figure out. Is this subsection 3 or section 5? It's subsection 3. It's talking about Con Ed New York, and what's been done here is it seems like maybe the parties were anticipating that Con Ed might jump ship, and they want it to kind of account for that possibility, and so they used the phrase are collected, and I'll just read it. Con Ed New York terminates its agreements with PJM during the period in which transition and charge adjustments are collected. Then blah, blah, blah, this stuff happens. So they're using the exact same phrase as the phrase before. Now, here's my question to you. If you're right that are collected means literally the money is going from one party to PJM, that would not explain what happens in the event that Con Ed New York jumped ship before the settlement was approved. So they've accounted for what will happen if Con Ed jumps. Under your theory, they've accounted for what would happen if Con Ed New York jumped ships after the settlement is approved, but they have not said anything about what would happen if Con Ed New York jumps ship. If Con Ed New York jumps ship before the settlement is approved, which seems to me an awfully large thing to not account for when you've written this whole paragraph all about what to do if Con Ed decides it doesn't want to be part of the service agreements anymore. So don't you think it's weird? Don't you think that if you're right about what are collected means, then this settlement agreement made a large and odd omission and failed to account for the possibility that Con Ed New York would terminate its agreements in this period between January 1st, 2016, and the period when the settlement agreement is approved? It's a good point and a good question, Judge Walker. I think ultimately, though, what the parties agreed to in subsection 3 is that Con Ed couldn't get out, and in fact, that subsection or that paragraph is really inoperative because if you look at the other provisions it says that adjustments can be changed only under paragraphs 1 and 2. So I think all this was really getting at was making clear that Con Ed can't get out, period. Does it allow Con Ed to get out, let's say, on June 20th, 2016? That's five days after the settlement agreement, but it's well in advance of when the settlement agreement would have been able to be approved and when literal collection would have been able to begin. I think under that circumstance, obviously, the settlement doesn't speak to that circumstance. That's my question. The fact that the settlement under your theory doesn't speak to that circumstance, to me, suggests that maybe your theory is not correct. Well, again, I think it's sort of hard because this provision is not actually operative. It doesn't really do anything, but I think probably what would likely happen is that they wouldn't be  if the settlement doesn't speak to that. If Con Ed wanted to get out, if Con Ed New York wanted to get out on June 20th, 2016, why would they not have been able to get out? Well, so Con Ed was actually due credits under the settlement, so they wouldn't have wanted to get out of these. Okay, so that's helpful. That's like a theory for why maybe this is done the way it's done. Exactly. Thank you. Thank you. All right. Thank you, gentlemen, and the case is submitted.
judges: Henderson, Katsas, Walker